

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

SK:DEL
F. #2019R01522

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 5, 2020

<u>By ECF and Email</u>

The Honorable Frederic Block
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    <u>United States v. Radeskoemar Koelfat</u>
            <u>Criminal Docket No. 19-551 (FB)</u>

Dear Judge Block:

      The government respectfully submits this letter in advance of the sentencing of defendant Radeskoemar Koelfat, which is scheduled for June 10, 2020, and in response to the defendant's sentencing memorandum filed on May 14, 2020, <u>see</u> ECF No. 43 ("Def. Mem.").

      As set forth in the Presentence Investigation Report ("PSR") and an Addendum to the PSR dated March 18, 2020 (the "PSR Addendum"), the United States Probation Department ("Probation") has estimated that the applicable United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range for the defendant is 24 to 30 months' imprisonment. The government respectfully submits that a sentence within the Guidelines range of 24 to 30 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

    I.    <u>The Offense of Conviction</u>

      On October 29, 2019, Koelfat and his codefendant and romantic partner Georgetiene Louise Beatrix Chan a Hung ("Chan a Hung") arrived at John F. Kennedy International Airport ("JFK") in Queens, New York, aboard a flight that originated in Suriname, a country on the northeast coast of South America. PSR ¶ 2. Customs and Border Protection ("CBP") officers observed that the couple looked visibly nervous when retrieving their luggage and selected them for a border enforcement examination. <u>Id.</u> The officers learned Koelfat and Chan a Hung have no friends or relatives in New York and were in possession of a reservation for a hotel in Baton Rouge, Louisiana. <u>Id.</u> ¶ 3. Upon being

questioned, both defendants admitted to ingesting pellets containing narcotics prior to their flight, which they intended to pass after their arrival in the United States. Id. Both Koelfat and Chan a Hung agreed to submit to an x-ray examination, which revealed foreign bodies in their abdomens and anal cavities. Id. Koelfat eventually passed a total of 61 pellets, which subsequent Drug Enforcement Administration ("DEA") lab testing revealed to contain a net weight of 371 grams of cocaine. Id. Chan a Hung eventually passed a total of 42 pellets, which subsequent DEA lab testing revealed to contain a net weight of 352 grams of cocaine. Id. Together, the couple attempted to import about 723 grams of cocaine.

In a post-arrest statement, Chan a Hung told the officers that she was approached by an individual in Suriname to import narcotics and she recruited Koelfat to help her. Id. ¶ 4. The defendants acknowledged that they traveled to the United States to import cocaine and expected to be paid about $30,000. Id.

After their arrest, Koelfat and Chan a Hung assisted law enforcement officers in an attempt to make a controlled delivery of the narcotics but the delivery was ultimately unsuccessful. This is Koelfat and Chan a Hung's only known trip to the United States involving the importation of narcotics. Id. ¶ 4.

Koelfat has been in custody at the Metropolitan Detention Center ("MDC") since he was arrested on October 29, 2019. Id. ¶ 30. During his incarceration, Koelfat has suffered from a medical condition known as an anal fistula. See Def. Mem. at 4. The Court held a conference on March 5, 2020 to discuss Koelfat's medical condition. Koelfat was scheduled for surgery in March to correct this condition but the surgery consultation was postponed due to the COVID-19 pandemic. The consultation has not yet been rescheduled due to the pandemic. According to the defendant's BOP medical records, he was last seen by medical staff on April 15, 2020 for a headache and back pain. He also asked when he would be seen by a specialist for his rectal complaints. As of May 27, 2020, counsel for the BOP informed the government that the defendant had not placed any electronic requests for medical care but could not confirm whether he had placed any paper requests.

II. Procedural History

On January 23, 2020, Koelfat pleaded guilty pursuant to a plea agreement before Magistrate Judge Ramon E. Reyes, Jr. to Count One of a four-count indictment.[1] Id. ¶ 1. Count One charged Koelfat with conspiracy to import more than 500 grams of cocaine into the United States, in violation of 21 U.S.C. §§ 963 and 960(b)(2)(B)(ii). Id. Counts Two through Four remain open, and the government intends to dismiss these counts at sentencing. In the plea agreement, the government agreed to take no position where within the Guidelines range determined by the Court the sentence should fall and make no motion for an upward departure.

---

[1] An unopposed motion to accept the defendant's guilty plea is currently pending before the Court. See ECF No. 38.

2

III. Guidelines Calculation

The government submits that the following Guidelines calculation, which is consistent with the calculation set forth in the PSR and the PSR Addendum, should be applied:

| | |
|---|---:|
| Base Offense Level (§ 2D1.1(a)(5) & (c)(8)) | 24 |
| Less: Minimal participation role adjustment (§ 3B1.2(a)) | -4 |
| Less: Acceptance of responsibility (§ 3E1.1) | -3 |
| Total: | **17** |

PSR ¶¶ 10–19 & Addendum ¶ 41. Accordingly, the total offense level is 17 and, based on a Criminal History Category of I, the advisory Guidelines range is 24 to 30 months in custody.[2] Addendum ¶ 41. The defendant also agrees this calculation is correct. Def. Mem. at 1.

IV. Argument

The Guidelines accurately reflect the seriousness of the defendant's conduct in conspiring to import a distribution-level quantity of narcotics, about 732 grams of cocaine, into the United States. See 18 U.S.C. § 3553(a)(1), (a)(2)(A). The defendant's lack of criminal history and role in the importation scheme does not remove this case from the heartland of drug importation cases. Moreover, a sentence within the Guidelines will provide adequate deterrence to others contemplating similar acts, which is a frequent and ongoing problem at New York airports. See 18 U.S.C. § 3553(a)(2)(B).

The defendant seeks a sentence of time served, which, from his initial imprisonment to the date of sentencing, would be approximately seven months in custody, arguing that this below-Guidelines sentence is warranted because he suffers from an anal fistula and is "particular[ly] vulnerability to a serious COVID-19 infection." Def. Mem. at 4. While the Court may consider the health risks to the defendant pursuant to § 3553(a)(2)(D), Koelfat's condition is not a reason for the Court to vary so significantly from the applicable Guidelines range.[3]

---

[2] The defendant is "safety valve" eligible and, thus, the otherwise-applicable five-year mandatory minimum does not apply in this case. See U.S.S.G. § 5C1.2. However, the defendant is not eligible for an additional reduction in his Guidelines range due to the Guidelines' mandate that the offense level, under the circumstances present here, be not less than 17. See PSR Addendum ¶ 19.

[3] While Koelfat does not specifically seek a downward departure under the Guidelines, the Guidelines provide an "extraordinary physical impairment may be a reason to

Koelfat, who is 53 years old, has no documented health conditions that make him particularly susceptible to contracting COVID-19. While Koelfat claims his anal fistula puts him at increased risk because it "weakens his immune system," and a weakened immune system is "a significant factor in co-morbidity with COVID-19," Def. Mem. at 4, he provides no details or medical documentation that his condition or medication puts him at increased risk for contracting COVID-19. Indeed, the N.Y. State Department of Health does not list an anal fistula or weakened immune system among the top 10 comorbidities for fatalities of COVID-19. See N.Y. State Department of Health, Fatalities: Top 10 Comorbidities by Age Group, available at https://covid19tracker.health.ny.gov/views/NYS-COVID19-Tracker/NYSDOHCOVID-19Tracker-Fatalities?%3Aembed=yes&%3Atoolbar=no (listing top 10 conditions for all ages groups as hypertension, diabetes, hyperlipidemia, dementia, coronary artery disease, renal disease, COPD, atrial fibrillation, cancer and stroke).

Koelfat next argues—again, without support—that the MDC's medical response to COVID-19 is inadequate. He relies on a 2019 editorial from the N.Y. Times, but the opinion piece discusses the MDC's response to the power and heat outage last winter, not the MDC's medical capabilities. Koelfat also repeats the bald speculation that MDC has failed to isolate COVID-19-positive inmates, citing only to United States v. Rabadi, 19-CR-353, a sealed proceeding in which it is unclear what allegations and findings were made.

Koelfat also attaches an affidavit by Dr. Homer Venters, filed in the civil case of Chunn et al. v. Edge, 20-CV-1590 (RPK) (E.D.N.Y. filed on Apr. 30, 2020). The defendant fails to identify any bearing that statements made by a plaintiffs' expert in a pending civil suit have to this Court's analysis of the sentencing factors set forth in 18 U.S.C. § 3553(a). In any event, in the civil suit, the government contests a number of the conclusions reached by Dr. Venters, as well as his methods for drawing those conclusions, and Judge Kovner will reconcile such differences. See generally id., ECF No. 99

---

depart downward." U.S.S.G. § 5H1.4 (emphasis added). With regard to what constitutes "extraordinary physical impairments," examples of defendants who have not met the standard include those who have had: "severe hypertension," "a coronary triple bypass," and "malignant cancer" removed from a kidney, United States v. Persico, 164 F.3d 796, 801, 806 (2d Cir. 1999) (affirming district court's refusal to depart); "cancer in remission, high blood pressure, a fused right ankle, an amputated left leg, and drug dependency," United States v. Guajardo, 950 F.2d 203, 208 (5th Cir. 1991) (same); "two potentially life-threatening health problems" that included "coronary heart disease" and "Hodgkin's disease," United States v. Johnson, 318 F.3d 821, 824–26 (8th Cir. 2003) (reversing district court's determination that departure was warranted); "chronic cardiovascular disease, chronic peripheral vascular disease with hypertension, obstructive pulmonary disease, and lower back pain of lumbar and lumbosacral origin," United States v. Krilich, 257 F.3d 689, 692–94 (7th Cir. 2001) (same); "congenital defect in [the defendant's] eye," coupled with injuries to an arm that followed a motorcycle accident, United States v. McQuilkin, 97 F.3d 723, 730 (3d Cir. 1996) (affirming district court's refusal to depart). None of these medical conditions are objectively any less serious or extraordinary than Koelfat's medical condition.

4

(Respondent's Post-Hearing Proposed Findings of Fact). Moreover, much of Dr. Venters' affidavits address means by which to protect inmates who are considered high-risk to the effects of COVID-19 due to underlying medical conditions. See ECF Nos. 99-1, 199-2. As explained, the defendant does not show his health condition places him at greater risk of serious illness should he contract COVID-19 while incarcerated.

In order to mitigate the spread of COVID-19, the BOP has developed national measures within its prisons. See Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp. These measures, which have been implemented at the MDC, include the following:

- Suspension of all social and legal visits: Social visits and legal visits have been suspended, although confidential attorney calls are being provided. Inmates will be provided additional inmate telephone minutes each month.

- Inmate movement: All inmate facility transfers have been suspended, with exceptions permitted for forensic studies or medical or mental health treatment.

- Screening and testing of inmates: All newly-arriving BOP inmates are screened for COVID-19 exposure risk factors and symptoms. Inmates with exposure risk factors are quarantined. Any inmate currently in BOP custody exhibiting symptoms consistent with COVID-19 will be assessed by the institution's health services staff and placed in medical isolation. The remainder of the inmates in his or her unit will be quarantined to ensure that additional inmates do not develop symptoms. The inmate in medical isolation will be evaluated by medical staff at least twice per day, and the inmates on a medically-quarantined unit will have their temperature checked twice per day. In addition, inmates will be tested for COVID-19 on a case-by-case basis in accordance with local health authority protocols.

- Modified Operations: The BOP is implementing modified operations nationally to maximize social distancing and limit group gatherings in BOP facilities, among other modifications specific to each facility.

On May 18, 2020, the Director of the Bureau of Prisons (BOP) ordered the implementation of Phase 7 of its COVID-19 Action Plan. This phase extends the above measures, as well as measures to contain movement and decrease the spread of the virus. These measures will remain in place through June 30, 2020, at which time the plan will be evaluated.

In addition, based on a March 18, 2020 letter from the Metropolitan Correctional Center ("MCC") and MDC to the Honorable Colleen McMahon, Chief Judge for the United States District Court in the Southern District of New York, and an April 16, 2020 letter from the MCC and MDC to the Honorable Roslynn R. Mauskopf, Chief Judge for

the United States District Court in the Eastern District of New York, the government is aware of the following additional measures that the MDC has taken in light of COVID-19:

- Cleaning supplies are issued once a week. They are available on each housing unit, and staff have been instructed regarding whom to contact should additional supplies be necessary.

- Staff are screening each staff member who enters the facility, including temperature scans.

- Inmate orderlies are cleaning the common areas of the institution, and every inmate has been reminded and instructed to continue to wipe down and sanitize their cells.

- Inmates have also been provided instruction via town halls regarding hygiene, and the same guidance is available on TRULINCS.

- Showers are available on a daily basis.

- Unit team staff are available on a daily basis for inmates to raise issues concerning food, shoes, and medical care.

As these measures demonstrate, the MDC is closely monitoring the status of the COVID-19 virus and is taking emergency steps to ensure the safety of its staff, inmates and the public.

Accordingly, the defendant's medical condition and generalized fear of contracting COVID-19 should not cause the Court to vary so significantly from the applicable Guidelines range.

V.  Conclusion

For the foregoing reasons, the government respectfully submits that a sentence within the applicable Guidelines range of 24 to 30 months is reasonable and appropriate in this case.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:  /s/ Devon Lash
Devon Lash
Assistant U.S. Attorney
(718) 254-6014

cc:  Sally Butler, Esq. & Christopher Wright, Esq. (by ECF and E-mail)
U.S. Probation Officer Jennifer Baumann (by E-mail)
Clerk of Court (FB) (by ECF and E-mail)